# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 20, 2014        Decided May 9, 2014

No. 13-5064

AMERICAN CIVIL LIBERTIES UNION AND AMERICAN CIVIL
LIBERTIES UNION FOUNDATION,
APPELLANTS

v.

UNITED STATES DEPARTMENT OF JUSTICE,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01157)

*Arthur B. Spitzer* argued the cause for appellants. With
him on the briefs were *Catherine Crump* and *David L. Sobel*.

*John S. Koppel*, Attorney, U.S. Department of Justice,
argued the cause for appellee. With him on the brief were
*Stuart F. Delery*, Assistant Attorney General, *Ronald C.
Machen Jr.*, U.S. Attorney, and *Leonard Schaitman*, Attorney.

Before: TATEL, BROWN, and KAVANAUGH, *Circuit
Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

2

Concurring opinion filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* BROWN.

TATEL, *Circuit Judge*: Three years ago, in *American Civil Liberties Union v. U.S. Department of Justice*, 655 F.3d 1 (D.C. Cir. 2011) (*ACLU I*), this court held that the Freedom of Information Act required the Justice Department to disclose case names and docket numbers for prosecutions in which the government had obtained cellular phone tracking data without a warrant and the defendant had ultimately been convicted. The court left open the question whether the Department would also have to disclose docket information for similar prosecutions in which the defendant had been acquitted or had the charges dismissed. Now squarely facing just that question, we conclude that given the substantial privacy interest individuals have in controlling information concerning criminal charges for which they were not convicted, the Department has properly withheld this information.

**I.**

In order to "open agency action to the light of public scrutiny," *Department of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (internal quotation marks omitted), FOIA requires federal agencies, "upon request, to make 'promptly available to any person' any 'records' so long as the request 'reasonably describes such records,'" *Assassination Archives & Research Center v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003) (quoting 5 U.S.C. § 552(a)(3)). This broad statutory mandate is subject to certain enumerated exemptions. *See* 5 U.S.C. § 552(b)(1)–(9). At issue here is FOIA Exemption 7(C), which provides that an agency may withhold "records or information compiled for law enforcement purposes" if disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy." *Id.* § 552(b)(7).

3

Determining whether an invasion of privacy is "unwarranted" within the meaning of Exemption 7(C) requires, as the Supreme Court held in *U.S. Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 776 (1989), "balanc[ing] the public interest in disclosure against the interest [in privacy] Congress intended the Exemption to protect."

In *Reporters Committee*, the Supreme Court considered the applicability of Exemption 7(C) to a request for an alleged mob figure's "rap sheet"—a document compiled by the FBI that "contain[ed] certain descriptive information, such as date of birth and physical characteristics, as well as a history of arrests, charges, convictions, and incarcerations." *Id.* at 752. Holding that the disclosure of such rap sheets implicates a substantial privacy interest, *id.* at 771, the Court rejected the contention that any interest in avoiding disclosure "approaches zero" simply because "events summarized in a rap sheet have been previously disclosed to the public," *id.* at 762–63. The Court explained that an individual's interest in privacy "encompass[es] the individual's control of information concerning his or her person," *id.* at 763, even though "the information may have been at one time public," *id.* at 767. Disclosure of a rap sheet, the Court found, was particularly troubling because it would in one fell swoop bring to light many facts about a person that might otherwise be subject to little public scrutiny. *See id.* at 769–71; *see also id.* at 764 (emphasizing the "distinction, in terms of personal privacy, between scattered disclosure of the bits of information contained in a rap sheet and revelation of the rap sheet as a whole"). On the other side of the balance, the Court found the public interest in disclosure to be fairly limited because a rap sheet would reveal little about "the *Government's* activities." *Id.* at 754. Thus, the Court held "as a categorical matter" that granting a "third party's request for

4

law enforcement records or information about a private citizen" that "seeks no 'official information' about a Government agency" would constitute an "'unwarranted'" invasion of privacy. *Id.* at 780.

The case now before us arose after the American Civil Liberties Union learned that federal law enforcement agencies were, without first securing a warrant, obtaining data from cellular phone companies that could be used to track phone users' whereabouts. The ACLU filed FOIA requests with the Drug Enforcement Administration and the Executive Office for United States Attorneys, seeking, among other things, records related to: "The case name, docket number, and court of all criminal prosecutions, current or past, of individuals who were tracked using mobile location data, where the government did not first secure a warrant based on probable cause for such data." To compel production of these records, the ACLU then sued the Department of Justice.

In response, the Department identified a large number of prosecutions—the total count is currently 229—in which a judge had, since September 2001, granted the government's application to obtain cell phone location data without making a probable cause determination. The Department refused to turn this list of cases over to the ACLU, claiming that the information fell within FOIA Exemption 7(C).

The parties each moved for summary judgment. The district court, then Judge Robertson, concluded that each of the individuals who had been prosecuted in these cases had a privacy interest in preventing disclosure of the requested information. The court went on to draw a distinction that neither party had directly advanced, according "a greater privacy interest to persons who were acquitted, or whose cases were dismissed or sealed (and remain under seal), and a

5

considerably lesser privacy interest to persons who were convicted, or who entered public guilty pleas." *American Civil Liberties Union v. U.S. Department of Justice*, 698 F. Supp. 2d 163, 166 (D.D.C. 2010). Determining that "the public has a substantial interest in the subject of cell phone tracking" that would be advanced by the requested disclosure, the court held that "the public interest in 'what the government is up to' outweighs the privacy interests of persons who have been convicted of crimes or have entered public guilty pleas; but . . . the privacy interests of persons who have been acquitted, or whose cases have been sealed and remain under seal, or whose charges have been dismissed, outweigh the public interest in disclosure of their names and case numbers." *Id.* The district court therefore directed the Department to disclose the requested information regarding prosecutions in which the government had secured a conviction but permitted it to withhold the information regarding the remaining cases.

Both sides appealed, and this court affirmed in part. We began our analysis by noting that, although the ACLU sought only the case name, court, and docket number of these prosecutions, courts "evaluating the privacy impact of the release of information . . . have taken into consideration potential derivative uses of that information." *ACLU I*, 655 F.3d at 7. The derivative uses to be made with the requested docket information were fairly substantial: with "little work," someone could "look up the underlying case files in the public records of the courts," *id.*, and could even attempt to contact the defendants, or their attorneys, directly, *id.* at 11–12. Nevertheless, we concluded that, with respect to those defendants who had ultimately been convicted, disclosure "would compromise more than a de minimis privacy interest, [but] it would not compromise much more." *Id.* at 12. We emphasized that, unlike in *Reporters Committee*, the

6

requested information pertained only to a single, relatively recent prosecution, the details of which were already "readily available to the public" and not at all "'practical[ly] obscure[]."" *Id.* at 9 (quoting *Reporters Committee*, 489 U.S. at 762) (alteration in original). As for the public interest, we determined that disclosure would have the significant benefit of "shedding light on the scope and effectiveness of cell phone tracking as a law enforcement tool," helping to "inform [the] ongoing public policy discussion" regarding the propriety of warrantless cell phone tracking. *Id.* at 13. "[I]n light of the strength of [this] public interest . . . and the relative weakness of the privacy interests at stake," we held that the district court had correctly rejected the Department's contention that production of this docket information would represent an "'unwarranted' invasion of privacy under Exemption 7(C)." *Id.* at 16.

Significantly, however, we did not affirm the district court's holding that information regarding acquittals, dismissals, or sealed cases could be withheld. We did observe that the distinction the district court had drawn "makes some intuitive sense, as both parties agree that the disclosure of information regarding [such cases] raises greater privacy concerns than the disclosure of information regarding public convictions or public pleas." *Id.* at 17. But, we continued, "whether that is enough of a distinction to justify withholding under Exemption 7(C) is a harder question." *Id.* Because it was unclear from the record whether there were any cases that fell within this category, we opted to forgo resolving the issue, instead vacating this portion of the district court's decision and "remand[ing] the case for th[e] court to determine whether any of the docket numbers refer to cases in which the defendants were acquitted, or to cases that were dismissed or sealed." *Id.*

7

Following our remand, the Department identified 214 prosecutions that had resulted in convictions or public guilty pleas and released the docket information for these cases. This left a total of fifteen prosecutions that were responsive to the ACLU's request and had ended in dismissals or acquittals, or had been sealed. Because the ACLU did not challenge the Department's authority to withhold the information regarding sealed cases, only six remain at issue—four of which were resolved by dismissal and two that ended in acquittal. *American Civil Liberties Union v. U.S. Department of Justice*, 923 F. Supp. 2d 310, 313 (D.D.C. 2013). Having established that these six cases in fact existed, Judge Amy Berman Jackson, to whom the case was assigned after Judge Robertson's retirement, again granted the Department's motion for summary judgment. *Id.* at 314.

The ACLU appeals, thus presenting us with the "harder question" we were previously able to avoid. *ACLU I*, 655 F.3d at 17. Our review is de novo. "In the FOIA context this requires that we ascertain whether the agency has sustained its burden of demonstrating that the documents requested are . . . exempt from disclosure under the FOIA." *Id.* at 5 (internal quotation marks omitted).

## II.

As in our previous decision, we begin by assessing the privacy interest at stake. The Department argues that "prosecuted-but-not-convicted individuals are . . . in a similar position to persons investigated or arrested but not prosecuted," and that this court has "accord[ed] a strong privacy interest to such individuals." Appellee's Br. 19. The ACLU argues that the privacy interests of defendants whose prosecutions resulted in dismissals or acquittals are only "marginally greater" than those of defendants who were

8

convicted—which, as we held in our prior decision, are nearly de minimis. Appellants' Br. 20. Each party overstates its case.

It is true, as the Department observes, that we have regularly concluded that individuals have a "strong interest" in avoiding disclosure of their involvement in "alleged criminal activity." *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) (internal quotation marks omitted); *accord, e.g.*, *People for the Ethical Treatment of Animals v. National Institute of Health*, No. 12-5183, slip op. at 9 (D.C. Cir. Mar. 14, 2014); *Fund for Constitutional Government v. National Archives & Records Service*, 656 F.2d 856, 866 (D.C. Cir. 1981). Those decisions, however, dealt with individuals who were either the subject of or involved in government *investigations* of criminal activity but never charged with a crime. *See ACLU I*, 655 F.3d at 7 n.8. Such individuals' privacy interests are strong in part because disclosure would "*reveal*[] *to the public* that the individual had been the subject of an . . . investigation." *Baez v. U.S. Department of Justice*, 647 F.2d 1328, 1338 (D.C. Cir. 1980) (emphasis added); *accord, e.g.*, *Branch v. FBI*, 658 F. Supp. 204, 209 (D.D.C. 1987). The privacy interest in preventing disclosure is diminished, however, if the fact of someone's involvement in alleged criminal activity is already a matter of public record— as will be the case when a defendant was indicted. *See Reporters Committee*, 489 U.S. at 763; *ACLU I*, 655 F.3d at 7 & n.8. Thus, we disagree with the Department that those who have been acquitted or had their cases dismissed and whose involvement in alleged criminal activity has already been publicly revealed are in the same situation as those who were never charged in the first place.

We likewise disagree with the ACLU that the privacy interests of defendants who were indicted but not convicted are essentially indistinguishable from those of defendants who

9

were convicted. To be sure, many of the factors we considered important in concluding that convicted defendants have a relatively weak privacy interest are equally applicable to those individuals whose interests we now consider here. In particular, just as was true with respect to convicted defendants, the requested docket information regarding defendants who were charged but not convicted would "disclose only information that has already been the subject of a public proceeding," is "available in public records," *ACLU I*, 655 F.3d at 8, and is likely readily accessible by the public through "computerized government services like PACER" or even a simple "Google search for that person's name," *id.* at 10. Indeed, as we have observed, this prior public exposure is precisely what distinguishes the individuals whose interests we consider in this case from those who have been investigated but not charged. But the fact that information about these individuals' cases is a matter of public record simply makes their privacy interests "fade," not disappear altogether. *ACLU I*, 655 F.3d at 9 (internal quotation marks omitted); *see Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 494–95 (1975) ("[T]he interests in privacy fade when the information involved already appears on the public record."); *see Reporters Committee*, 489 U.S. at 767 ("[O]ur cases have . . . recognized the privacy interest inherent in the nondisclosure of certain information even where the information may have been at one time public."). Consistent with our decision in *ACLU I*, we reject the dissent's surrender of any reasonable expectation of privacy to the Internet—a surrender that would appear to result from a failure to distinguish between the mere *ability* to access information and the likelihood of actual public *focus* on that information. *See* Dissenting Op. at 4–6; *cf. United States v. Jones*, 132 S. Ct. 945, 964 (2012) (Alito, J., concurring) (concluding that individuals generally have a reasonable expectation in being free of long-term GPS surveillance notwithstanding the ready

10

availability of this technology); *id.* at 957 (Sotomayor, J., concurring) (suggesting that "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties," as that "approach is ill suited to the digital age"). And if individuals not convicted have a substantially greater privacy interest than convicted individuals to start with, then even after both interests are discounted due to prior public revelation, the former interest will remain substantially greater than the latter.

In our view, defendants whose prosecutions ended in acquittal or dismissal have a much stronger privacy interest in controlling information concerning those prosecutions than defendants who were ultimately convicted. The presumption of innocence stands as one of the most fundamental principles of our system of criminal justice: defendants are considered innocent unless and until the prosecution proves their guilt beyond a reasonable doubt. *See Coffin v. United States,* 156 U.S. 432, 453 (1895) ("The principle that there is a presumption of innocence in favor of the accused is the undoubted law, axiomatic and elementary, and its enforcement lies at the foundation of the administration of our criminal law."). Individuals who are charged with a crime and ultimately prevail of course remain entitled to a version of this presumption. In the eyes of the law, they are not guilty. *Cf. Herrera v. Collins,* 506 U.S. 390, 399–400 (1993) (following conviction, "the presumption of innocence disappears," and "[t]hus, in the eyes of the law, petitioner does not come before the Court as one who is 'innocent'"). Unfortunately, public perceptions can be quite different. Aware of the heavy burden of proof that the government must satisfy in a criminal prosecution, many may well assume that individuals charged with a crime likely committed that crime regardless of how the case was ultimately resolved. "We all know," ACLU

11

counsel candidly observed at oral argument, "there are some guilty people who are not convicted." Oral Arg. Rec. 27:03–:08. Or as former Secretary of Labor Raymond Donovan wondered after being acquitted of larceny and fraud, "Which office do I go to to get my reputation back?" Selwyn Raab, *Donovan Cleared of Fraud Charges by Jury in Bronx*, N.Y. Times, May 26, 1987, at A1. Thus, if the right to privacy is, at its essence, "the right to be let alone," *Olmstead v. United States*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting), those who are acquitted or whose charges are dismissed have an especially strong interest in being let alone. Although the fact that such defendants were accused of criminal conduct may remain a matter of public record, they are entitled to move on with their lives without having the public reminded of their alleged but never proven transgressions.

This special interest in shielding those charged with but not convicted of a crime is reflected in state laws that limit the disclosure of criminal history summaries involving data other than convictions. *See, e.g.*, Conn. Gen. Stat. § 54-142n ("Nonconviction information other than erased information may be disclosed only to: (1) Criminal justice agencies . . . ; (2) agencies and persons which require such information to implement a statute or executive order that expressly refers to criminal conduct; (3) agencies or persons authorized by a court order, statute or decisional law to receive criminal history record information."); Haw. Rev. Stat. § 846-9 (providing that "[d]issemination of nonconviction data shall be limited" to certain specified entities, but that "[t]hese dissemination limitations do not apply to conviction data"); *see also Reporters Committee*, 489 U.S. at 754 n.2 (observing that "[i]n general, conviction data is far more available outside the criminal justice system than is nonconviction data," and that in "47 states nonconviction data cannot be disclosed at all for non-criminal justice purposes, or may be

12

disclosed only in narrowly defined circumstances" (internal quotation marks omitted)). It is also reflected in statutes and court decisions providing for the sealing of cases in which the defendant was never convicted. *See, e.g.,* N.Y. Crim. Proc. Law § 160.50 ("Upon the termination of a criminal action or proceeding against a person in favor of such person . . . , unless . . . the court . . . determines that the interests of justice require otherwise . . . , the record of such action or proceeding shall be sealed . . . ."); Ohio Rev. Code § 2953.52 ("Any person, who is found not guilty of an offense by a jury or a court or who is the defendant named in a dismissed complaint, indictment, or information, may apply to the court for an order to seal the person's official records in the case."); *see also* John P. Sellers, III, *Sealed with an Acquittal: When Not Guilty Means Never Having to Say You Were Tried,* 32 Cap. U. L. Rev. 1 (2003) (describing Ohio courts' expansive use of this power). Perhaps most important for our purposes, it is an interest whose relative significance is reflected in our prior decision in this case, in which we observed that the privacy interests of defendants who have been convicted "are weaker than for individuals who have been acquitted or whose cases have been dismissed." *ACLU I,* 655 F.3d at 7; *see also id.* at 8 (emphasizing that, unlike in *Reporters Committee,* the requested disclosure would "disclose only information concerning a conviction or plea; it would not disclose mere charges or arrests"). Indeed, even our dissenting colleague appears to acknowledge the relative strength of this interest. *See* Dissenting Op. at 2 (stating that the privacy interests here are "marginally greater than they were in *ACLU I*").

Release of the docket information the ACLU seeks would substantially infringe this privacy interest. It would create the risk—perhaps small, *see ACLU I,* 655 F.3d at 10–11, but nonetheless real—that renewed attention would be paid to the

13

individuals who were the subject of these prosecutions. While this attention would have been warranted at the time of indictment, now that these defendants have been acquitted or had the relevant charges dismissed they have a significant and justified interest in avoiding additional and unnecessary publicity. For example, someone who had been acquitted of accounting fraud after a full and fair trial, moved on with his life, and started a family might be especially dismayed were his neighbors, friends, and family to learn about his previous prosecution due to the publicity associated with the release of the requested information. Or what of a defendant charged with producing child pornography whose case was dismissed after the government identified the real perpetrator, yet is nevertheless viewed with suspicion by those who learn of his mere involvement in such a case? If, as the Supreme Court put it in *Reporters Committee*, an "ordinary citizen" has a privacy interest "in the aspects of his or her criminal history that may have been wholly forgotten," certainly that interest is particularly great when the ordinary citizen was never actually convicted but nonetheless might be presumed by the public to have been guilty. 489 U.S. at 769. Release of this information would also permit the ACLU or others to contact the defendants in question in order to learn more about their cases, something the ACLU has expressly told us it plans to do. Though "relatively minimal," *ACLU I*, 655 F.3d at 11, such an intrusion may be especially undesirable for individuals who are understandably trying to put their past ensnarement in the criminal justice system behind them.

## III.

Having concluded that defendants who were acquitted or had their cases dismissed have a substantial privacy interest at stake, we must now balance this interest against the public interest in disclosure. Such balancing decisions, generally speaking, are among the most challenging sorts of cases that

14

judges face. Indeed, the task brings to mind the rhetorical question often attributed to Chief Justice Traynor of the California Supreme Court: "Can you weigh a bushel of horsefeathers against next Thursday?" Brainerd Currie, *The Disinterested Third State*, 28 Law & Contemp. Probs. 754, 754 (1963); *cf. also* William Prosser, *Res Ipsa Loquitur in California*, 37 Cal. L. Rev. 183, 225 (1949) ("A presumption . . . can no more be balanced against evidence than ten pounds of sugar can be weighed against half-past two in the afternoon.") (internal quotation marks omitted)). In this case, however, the comparison is not so amorphous and the balance, while close, is nonetheless clear.

The ACLU argues that because warrantless cellphone tracking remains an issue of great public concern, the public interest in disclosure is the same as it was the last time this case was before us. According to the Department, however, the public interest in the disclosure of these six prosecutions is reduced by the prior disclosure of the 214 prosecutions that resulted in convictions. In support, the Department relies on *Schrecker v. U.S. Department of Justice*, 349 F.3d 657 (D.C. Cir. 2003), in which we observed that a court's "inquiry" into the interest in disclosure "should focus not on the general public interest in the subject matter of the FOIA request, but rather on the *incremental value* of the specific information being withheld." *Id.* at 661 (emphasis added).

We have no need to wade into this debate. Even assuming, as the ACLU contends, that the public interest in the disclosure here equals that in *ACLU I*, that interest pales in comparison to the substantial interests in privacy that are now at stake. The line drawn by Judge Robertson between prosecutions that result in convictions and those that result in dismissals or acquittals is not just one that "makes some intuitive sense," as we put it in our prior opinion; it is, we

15

now hold, a distinction that is fully consistent with FOIA. Given the fundamental interest individuals who have been charged with but never convicted of a crime have in preventing the repeated disclosure of the fact of their prosecution, we have little hesitation in concluding that release of the remaining information the ACLU seeks "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Indeed, the government, having brought the full force of its prosecutorial power to bear against individuals it ultimately failed to prove actually committed crimes, has a special responsibility—a responsibility it is fulfilling here—to protect such individuals from further public scrutiny.

## IV.

One last issue demands our attention. The ACLU argues that neither this court nor the district court could properly conclude that the Exemption 7(C) balance tilts in favor of withholding because the Department has failed to provide the information necessary to make that determination. The ACLU lists seventeen facts the Department has refused to provide—facts relating to the specifics of the litigation in these six cases, the particular defendants charged, and the degree to which the cases received prior publicity. This information, it claims, might either increase the public benefit that would flow from disclosure of this particular docket information or decrease the privacy interest at stake. To the extent they are relevant at all, however, sixteen of the seventeen specifics the ACLU contends the Department should have produced are facts for which the burden of production actually lies with the ACLU. *See National Archives & Records Administration v. Favish*, 541 U.S. 157, 172 (2004) ("Where the privacy concerns addressed by Exemption 7(C) are present, the exemption requires the person requesting the information to establish a sufficient reason for the disclosure."); *Afshar v.*

16

*Department of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) ("[A] plaintiff asserting a claim of prior disclosure must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld.").

The one piece of information requested by the ACLU that the government would have to produce is whether any of the defendants have died. As we have held, not only is an individual's death "a relevant factor" in assessing the privacy interests implicated by a disclosure involving that individual, but in some circumstances the government must take "certain basic steps to ascertain whether an individual [is] dead or alive." *Schrecker v. U.S. Department of Justice*, 254 F.3d 162, 166–67 (D.C. Cir. 2001). But although death may "diminish" the relevant privacy interests, it "by no means extinguishes" them because "one's own and one's relations' interests in privacy ordinarily extend beyond one's death." *Id.* at 166; *see also Swidler & Berlin v. United States*, 524 U.S. 399, 407 (1998) (holding that the attorney-client privilege survives the client's death because "[c]lients may be concerned about reputation, civil liability, or possible harm to friends or family" and "[p]osthumous disclosure . . . may be as feared as disclosure during the client's lifetime"). Here, even assuming any of the six individuals who were the subject of the prosecutions at issue have died, the relevant privacy interests remain substantial. Deceased defendants never convicted of a crime retain a reputational interest in keeping information concerning their prosecutions out of the public eye. They may also have family members who themselves have a legitimate interest in avoiding the increased scrutiny that could follow from the release of the requested docket information. *Cf. Favish*, 541 U.S. at 170 ("FOIA recognizes surviving family members' right to personal privacy with respect to their close relative's death-scene images."). Given the substantial nature of these interests, we conclude that withholding the requested

17

docket information would be justified under Exemption 7(C) even if some or all of the underlying defendants were dead. Accordingly, the district court properly granted the Department's motion for summary judgment notwithstanding the Department's apparent failure to investigate this issue.

## V.

For the forgoing reasons, we affirm the district court's grant of summary judgment to the Department.

*So ordered.*

TATEL, *Circuit Judge*, concurring: The court's opinion assumes without deciding that the public interest in disclosure of the docket information for these six prosecutions is just as great as was the interest in disclosing the information for the 214 prosecutions the Justice Department was previously ordered to release. *See* Majority Op. at 14. I write separately to explain why I believe this prior disclosure has substantially reduced the value of the remaining information the ACLU continues to seek, thus further tilting the balance in favor of withholding.

In evaluating the public benefit of disclosure under FOIA Exemption 7(C), D.C. Circuit precedent requires that we focus on the "incremental value" of the "specific information" sought. *Schrecker v. U.S. Department of Justice*, 349 F.3d 657, 661 (D.C. Cir. 2003); *accord, e.g., Bast v. U.S. Department of Justice*, 665 F.2d 1251, 1254 (D.C. Cir. 1981); *King v. U.S. Department of Justice*, 830 F.2d 210, 234–35 (D.C. Cir. 1987). That is, instead of simply asking whether there might be some general public interest in the subject matter of the FOIA request, we ask *whether and how* the information sought in a particular FOIA request will actually cast light on the government's activities. *See, e.g., ACLU v. U.S. Department of Justice*, 655 F.3d 1, 12–16 (D.C. Cir. 2011) (*ACLU I*). Examining the incremental value of a given disclosure follows from the basic purpose of the Exemption 7(C) balancing test: determining whether a particular record or piece of information is worth the privacy costs of release requires an assessment of the potential benefits that would actually flow from release.

When assessing the "incremental value" of the information sought, we of course apply the common sense notion that the value of information depends on the mix of data already publicly available—including that previously released by the agency subject to the FOIA request. In *U.S. Department of State v. Ray*, 502 U.S. 164 (1991), the

2

Supreme Court illustrated this approach in the process of analyzing the benefit of disclosing information retained pursuant to FOIA Exemption 6, a parallel exemption that authorizes withholding records if disclosure would "constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). In *Ray*, the State Department had released documents relating to its efforts to monitor Haiti's compliance with its promise not to persecute certain refugees. In doing so, however, the State Department redacted information regarding the identity of the refugees—information that, as the Court recognized, would, in a vacuum, have been helpful to the FOIA requesters because it would have enabled them to track down the refugees and ask them about any persecution. *See Ray*, 502 U.S. at 171, 177; *cf. id.* at 179 (observing that the Court's resolution of the case allowed it to avoid deciding whether derivative uses of disclosed information could qualify as a public interest in disclosure); *ACLU I*, 655 F.3d at 15 ("this court takes derivative uses into account in evaluating the impact of disclosure on the public interest"). The dissent cannot simply misquote away the value of this information. *See* Dissenting Op. at 9 (quoting from section of the Court's opinion describing the Eleventh Circuit's conclusion "that the redacted information would not, in and of itself, tell respondents anything about Haiti's treatment of the returnees or this Government's honesty, but . . . the indirect benefit of giving respondents the means to locate the Haitian returnees and to cross-examine them provided a public value that required disclosure," *Ray*, 502 U.S. at 170–71.) Nevertheless, the Court rejected an effort to ascertain the refugees' identities because the "public interest" had already been "adequately served by disclosure of the redacted interview summaries." *Ray*, 502 U.S. at 178. It explained that the released "documents reveal how many returnees were interviewed, when the interviews took place, the contents of individual interviews, and details about the status of the

3

interviewees." *Id.* Thus, it concluded, "[t]he addition of the redacted identifying information would not shed any *additional* light on the Government's conduct of its obligation." *Id.* (emphasis added). As the Court reiterated in even clearer language: "[T]here is nothing in the record to suggest that a second series of interviews with the already-interviewed returnees would produce any relevant information that is not set forth in the documents that have already been produced." *Id.* at 179; *accord, e.g., Painting & Drywall Work Preservation Fund v. Department of Housing & Urban Development*, 936 F.2d 1300, 1303 (D.C. Cir. 1991) (concluding that the public interest in the disclosure of worker records that would provide information on agency enforcement efforts was minimal because interested parties could obtain similar information through alternative means). Perhaps, as the dissent suggests, the relevant privacy interest in *Ray* was more substantial than here. *See* Dissenting Op. at 8. But FOIA requires us to balance privacy interests against the benefits of disclosure, and the critical point for our purposes is that in *Ray* the Court evaluated the latter by examining the incremental effect of the information sought in light of prior disclosures.

Consistent with the forgoing principles, and given the unique way in which this case has evolved, I believe that the public interest at issue here is less than it was when the case was previously before us. Of course, there is little doubt that "[t]he use of and justification for warrantless cell phone tracking" continues to be a "topic of considerable public interest." *ACLU I*, 655 F.3d at 12; *see, e.g.*, Kate Zernike, *Court Restricts Police Searches of Phone Data*, N.Y. Times, July 19, 2013, at A1 (describing differing positions taken by courts on the legality and propriety of this investigatory technique); Joe Palazzolo, *Montana Requires Warrants for Cell Phone Tracking*, Wall St. J. L. Blog, June 21, 2013,

4

http://blogs.wsj.com/law/2013/06/21/montana-requires-warrants-for-cell-phone-tracking (describing efforts by states to require police to obtain a warrant in order to access cell phone tracking information). The disclosure of these six cases could also "shed[]" at least some additional "light on the scope and effectiveness" of this practice. *ACLU I*, 655 F.3d at 13.

But most of the benefit we anticipated from the release of the requested docket information flowed from the fact that access to a large sample of prosecutions would provide a basis for the public to discern general trends regarding the government's use of cellphone tracking data and the means by which the government obtains such data. For example, we observed that disclosure would "provide information about the kinds of crimes the government uses cell phone tracking data to investigate," the "standards the government uses to justify warrantless tracking," and "facts regarding the duration of tracking and the quality of tracking data." *Id.* at 13–14. As a result of the district court's and our own prior decisions, however, the Department has already released docket information for 214 prosecutions in which the government obtained cell phone tracking data without a warrant, and those 214 cases presumably provide much of the necessary basis for assessing when, how, and why the government utilizes this particular investigative tool. *Compare with id.* at 14–15 (rejecting government's argument that release of the information was unnecessary due to the "extensive public attention that this issue is already receiving," because "much of the information the plaintiffs seek to develop from the FOIA disclosure . . . is not currently in the public domain" (internal quotation marks omitted)). True, the six remaining cases could contain some interesting anecdotal evidence: the ACLU speculates that it is "more likely that a failed prosecution involved" a "motion[] to suppress evidence

5

derived from cell phone tracking," and that suppression
hearings are particularly likely to yield useful information.
Appellants' Br. 33–34; *see also ACLU I*, 655 F.3d at 14
(describing information that could be derived from
suppression hearings). Even so, if the Department's disclosure
of 214 prosecutions has failed to reveal the nature and extent
of the government's practice of obtaining cell phone tracking
data without a warrant, the probability that disclosure of these
six remaining cases would yield significant benefits is
relatively low. To paraphrase the Supreme Court in *Ray*, there
is little to suggest that these six cases "would produce any
relevant information that is not set forth in the [214
prosecutions] that have already been produced." 502 U.S.
at 179.

The ACLU argues that applying the "incremental value"
test in this fashion would give federal agencies license to
arbitrarily withhold portions of requested records—
presumably "the more important or embarrassing responsive
records"—on the ground that the public interest in disclosure
will be satiated by the records they choose to actually release.
Appellants' Br. 35. Although I have no doubt that this court
would look with great suspicion on any attempt to manipulate
FOIA in this fashion, this case involves no such mischief. It is
well-established that federal agencies may disclose particular
records or portions of records responsive to a request without
disclosing *all* responsive records so long as they have some
legitimate FOIA-based reason for doing so. *See* 5 U.S.C.
§ 552(b) ("Any reasonably segregable portion of a record
shall be provided to any person requesting such record after
deletion of the portions which are exempt . . . .");
*Assassination Archives & Research Center v. CIA*, 334 F.3d
55, 58 (D.C. Cir. 2003); *see also, e.g., Ray*, 502 U.S. at 178–
79; *King*, 830 F.2d at 234–35 (D.C. Cir. 1987) (permitting
government to release investigative report with portions

6

redacted in order to protect privacy interest of individuals named). When, for example, an agency withholds certain records that implicate greater privacy interests than those it releases, and then evaluates the public benefit of releasing these remaining records in light of the information already released, it acts just as FOIA requires—efficiently trading off privacy costs and disclosure benefits. That is almost exactly what happened here. Having released all of the information our prior decision required, the Department now resists disclosure of a particular type of information that implicates stronger privacy interests. That being so, I see no reason to now disregard this prior disclosure. Just as we would certainly take account of the existence of the docket information for these 214 cases had it been uncovered and published by the Washington Post, we may take account of it here even though its release resulted from this litigation.

BROWN, *Circuit Judge*, dissenting: While I sympathize with the court's protective instincts, I subscribe to Lady Macbeth's drear insight: "What's done cannot be undone." Redemption is still possible, but in the modern world, the right to be left alone, once forfeited, is gone for good. An individual who is indicted and tried has no privacy interest that can protect the public record of prosecution from disclosure—even if the ultimate outcome was acquittal or dismissal. The residual privacy concerns we identified in *ACLU I* are insufficient to meet the Exemption 7(C) threshold. There we noted that the privacy right at common law rested in large part on the "degree of dissemination," and that "interests in privacy *fade*" when the information is already part of the public record and is readily available. *Am. Civil Liberties Union v. U.S. Dep't of Justice (ACLU I)*, 655 F.3d 1, 9 (D.C. Cir. 2011). Because the privacy interest here started small and the pace of technology continues to diminish it, I respectfully dissent.

At the outset, I should note the court does get one thing right. As a general matter, judges tasked with balancing equally metaphysical concepts, like privacy and the public interest, face what are among the most difficult and largely standardless endeavors. *See Reporters Comm. for Freedom of Press v. U.S. Dep't of Justice*, 816 F.2d 730, 741 (D.C. Cir. 1987) (expressing doubt that there is any principled basis for federal judges to make such ad hoc and idiosyncratic determinations). Even so, I agree the balancing in this case is relatively clear. The six disputed records already exist in the public domain. Indeed, the court acknowledges the records are accessible via a simple Google search or through PACER. Furthermore, the court correctly determines the public interest in disclosure is no more or less than it was in *ACLU I*. There, we characterized the public interest as "significant." *ACLU I*, 655 F.3d at 12. With one arm of the balance thus weighted, the only question is whether the privacy interests of unconvicted persons tip the scales against disclosure. The

2

court today holds that the contest, while close, is nevertheless
convincingly won by a supposedly more substantial privacy
interest. I am not persuaded. On balance, the permanence
and accessibility of the records render any privacy interests
only marginally greater than they were in *ACLU I*, thus
tipping the balance in favor of disclosure.

The majority's privacy analysis rests on two pillars: the
presumption of innocence and the common law of
informational privacy. Both notions have shortcomings.
First, the presumption of innocence is an artifact of the
common law's adversarial approach to the question of guilt.
What authority exists for the proposition that the presumption
of innocence affords indicted, but unconvicted, persons some
measure of informational privacy? The Supreme Court has
made it clear that the presumption of innocence applies *only*
to a criminal trial and, within the trial, *only* to the jury or other
trier of fact. *See Bell v. Wolfish*, 441 U.S. 520, 533 (1979)
("The presumption of innocence is a doctrine that allocates
the burden of proof in *criminal trials*; it also may serve as an
admonishment to the *jury* to judge an accused's guilt or
innocence solely on the evidence adduced at *trial* . . . ."
(emphasis added)). Any other, extra-trial reference to the
doctrine is both imprecise and impotent. If, as the Supreme
Court posits, the presumption of innocence is purely an
instrument for allocating the burden of proof at trial and
warning jurors against drawing untoward inferences, then
there is no basis for supposing the presumption of innocence
governs events beyond the trial itself. *Contra* Majority Op. at
10 ("Individuals who are charged with a crime and ultimately
prevail of course remain entitled to a version of this
presumption [of innocence]."). And why would a common
law presumption trump FOIA's statutory mandate?

3

The court hypothesizes the plight of individuals who, though never convicted, are viewed with suspicion when others learn of their mere involvement in particularly ignoble cases. *See* Majority Op. at 13. But even if true, persons who are publicly indicted and tried can have no reasonable expectation that the occurrence of these events will not be publicly disclosed. Risk of disclosure inheres in the very nature of these *public* proceedings. *See Craig v. Harney*, 331 U.S. 367, 374 (1947) ("A trial is a public event. What transpires in the court room is public property."). To be sure, we previously discounted the small but nonetheless real risk of renewed attention, dismissing such concerns as sheer "speculation." *See ACLU I*, 655 F.3d at 10–11 ("Such a list [of publicly indicted persons] is surely less likely to draw attention to a name than was the initial press coverage of an indictment . . . .").

Furthermore, what of the need for an informed citizenry to hold public officials accountable? One "purpose of FOIA is to permit the public to *decide for itself* whether government action is proper." *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 264 (D.C. Cir. 1984) (emphasis added); *see also* Richard A. Epstein, *Privacy, Publication, and the First Amendment: The Dangers of First Amendment Exceptionalism*, 52 STAN. L. REV. 1003, 1004, 1047 (2000) (discussing as a counterweight to privacy goals, the social ideal of full disclosure of information about others to allow individuals to make "full and informed decisions on matters of great importance"); Sadiq Reza, *Privacy and the Criminal Arrestee or Suspect: In Search of a Right, in Need of a Rule*, 64 MD. L. REV. 755, 807 (2005) ("The government should arguably inform the public about its suspicions regarding an arrestee or suspect so that people may practice 'informed living,' the right to exercise an informed choice about those with whom they live and associate. That is, X should have

4

access to information that Y has been arrested for or suspected of a crime so that X can decide intelligently whether to socialize with Y, let her children play with Y's children, patronize Y's business, or use Y's professional services, and so forth."). From the point of view of the wrongfully accused, this will be a continuing injustice, but a person can be found not guilty and still not be innocent of the crime charged. *See Rigsbee v. United States*, 204 F.2d 70, 72–73 (D.C. Cir. 1953) (holding that an acquittal differs from innocence and that the former would be insufficient by itself to obtain a certificate signifying the latter). The rough balance courts must strike can never resolve such anomalies.

The Court's reliance on common law informational privacy doctrine is similarly unavailing. "[B]oth the common law and the literal understandings of privacy encompass the individual's control of [personal] information." *Reporters Comm.*, 489 U.S. at 763. The touchstone of informational privacy—the right to be let alone—has long rested on the degree to which an allegedly private fact has been disseminated, and the extent to which the passage of time has rendered it private. *Id.* Nevertheless, technological advances seem to presage the death knell for this previously workable standard. In today's echo chamber of big data, metadata, and the Internet, the once wholly forgotten memory of some unsavory, minimally broadcast misdeed is resurrected for global consumption. Against this backdrop, it seems fanciful to believe that individuals who were publicly indicted but never convicted (though in some cases publicly tried), retain an objective, substantial privacy interest in controlling information about these public facts.

The court says unconvicted persons are "entitled to move on with their lives without having the public reminded of their alleged but never proven transgressions." Majority Op. at 11.

5

Alas, Google, unlike God, neither forgets nor forgives.[1] Indeed, Google is not alone in its uncanny ability to keep the proverbial score. It is true that most jurisdictions treat aggregations of data confidentially, but they also insist on transparency for records of individual cases. Courts, too, have a penchant for reminding acquitted individuals of their "alleged but never proven transgressions." *See, e.g., Dowling v. United States*, 493 U.S. 342, 354 (1990) (holding that admission of evidence relating to a crime the defendant had previously been acquitted of committing did not violate double jeopardy or due process); *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 356–66 (1984) (holding that a gun owner's acquittal on criminal charges involving firearms did not preclude a subsequent *in rem* forfeiture proceeding against those firearms under 18 U.S.C § 924(d)); *United States v. Foster*, 19 F.3d 1452, 1455 (D.C. Cir. 1994) (noting that virtually every circuit permits enhancement of sentence based on acquitted conduct).

The proposition that "an 'ordinary citizen' has a privacy interest 'in the aspects of his or her criminal history that may have been wholly forgotten,'" Majority Op. at 13 (citing *Reporters Committee*, 489 U.S. at 769), is thus inapt. Thanks to the Internet (for better or worse), information that was once scattered, localized, and forgotten with the passage of time is now effectively permanent and searchable. And though one might wish quietly to melt into the shadow of obscurity, the inexorable march of time is simply no match for the unflagging, unforgiving memory that is the World Wide Web.

---

[1] There are exceptions, of course, but records memorializing a public indictment and trial do not appear to be one of them. *See Removal Policies*, GOOGLE, https://support.google.com/websearch/answer/2744324#offen siveimages (last visited Apr. 23, 2014).

6

Once a secret is disclosed online, neither the courts nor society may unring the lingering echo of the bell. In this respect, *Reporters Committee* is an anachronism. The aspects of an "ordinary citizen['s]" criminal history the Court thought would be wholly forgotten were the data contained in rap sheets, which were maintained in a localized computer database. *See Reporters Comm.*, 489 U.S. at 752, 771; *see also ACLU I*, 655 F.3d at 8. Nowadays, bits and pieces of data are aggregated and immortalized on public and private systems, and the private systems have no purge schedules.

This is not to say the modern man has abdicated any expectation of privacy in facts partially disclosed. As the Supreme Court observed, "the fact that an event is not wholly private does not mean that an individual has no interest in limiting disclosure or dissemination of the information." *Reporters Comm.*, 489 U.S. at 770. But there is a vast chasm between facts disclosed to a discrete group that otherwise treats the information as private and facts that are unqualifiedly revealed and accessible to virtually everyone. In my view, the case before us falls into the latter camp. *Cf. id.* at 752 ("As a matter of executive policy, [DOJ] has generally treated rap sheets as confidential and, with certain exceptions, has restricted their use to governmental purposes."); *Dep't of Air Force v. Rose*, 425 U.S. 352, 359–60 (noting that the Academy treated "all matters discussed" at hearings for honor code violations as "confidential," marked case summaries "for official use only," and instructed cadets "not to read the case summary unless they have a need, beyond mere curiosity, to know their contents").

Considering the fissures in the two pillars supporting the court's privacy analysis, one would expect the privacy interests to become less significant. At the very least, these serious deficits ought give way to the court's obligation to

7

"make a reasonable effort to account for the death of a person on whose behalf the [agency] invokes Exemption 7(C). *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 662 (D.C. Cir. 2003). This would include the deaths of family members. After all, "death clearly matters, as the deceased by definition cannot personally suffer the privacy-related injuries that may plague the living." *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 33 (D.C. Cir. 1998). I am not swayed by the majority's contention that reputational interests are enough to carry the day. The posthumous reputational interest the Supreme Court recognized in *Swidler & Berlin v. United States*, 524 U.S. 399 (1998), is the one rooted in the venerable attorney-client privilege, not informational privacy. *See id.* (holding that the attorney-client privilege survives a client's death).

One last point warrants discussion. Judge Tatel's concurrence seeks to lend credence to DOJ's invocation of the incremental value test—a test allegedly of precedential value. I am not so certain. First, the test is of dubious provenance. In *King v. U.S. Dep't of Justice*, 830 F.2d 210, 234 (D.C. Cir. 1987), the case cited by *Schrecker* as authority for its statement about the incremental value test, the court never actually used the words "incremental value." Instead, the court merely held that, because the appellant failed to demonstrate how disclosing the redacted names was relevant to the public interest, the privacy interests "outweighed any public interest attending disclosure." *See id.* at 234–35. That is all. *King* did *not* hold that the incremental value of information depends on the mix of data already publicly available.

In the 200-plus FOIA cases since the *Schrecker* decision, we have referenced the incremental value test only three times. In each instance, we have understood it to mean

8

exactly the opposite of what the concurrence posits: "even if the 'absolute value' of the requested information is small, it must nevertheless be released if it adds *any* incremental value of public interest." Appellants' Reply Br. at 15; *see ACLU I*, 655 F.3d at 15 (rejecting DOJ's "incremental contribution" argument because "[t]he fact that the public already has *some* information does not mean that more will not advance the public interest" (emphasis added)); *Lardner v. U.S. Dep't of Justice*, 398 F. App'x 609, 611 (D.C. Cir. 2010) (affirming the district court's decision to disclose the identities of denied pardon and commutation applicants despite the previous disclosure and existence of approved applicants' identities on the public record.    Significantly, the court noted: "The incremental value of the withheld information is not speculative . . . ."); *Consumers' Checkbook Ctr. for the Study of Servs. v. U.S. Dep't of Health & Human Servs.*, 554 F.3d 1046, 1060 (D.C. Cir. 2009) (Rogers, J., concurring in part and dissenting in part) ("[E]ven though the requested data will only partially reveal physicians' experience levels, the data has 'incremental value' for ascertaining the quality of services performed.").

In any event, even assuming the court is bound by the version of the incremental value test Judge Tatel espouses, the cases cited in support of this test are all distinguishable for one reason or another. *In Ray*, for example, the privacy interests were more significant than those implicated here. The information redacted from the disputed records was obtained via interviews with requested Haitians who were promised confidentiality. *U.S. Dep't of State v. Ray*, 502 U.S. 164, 172 (1991). In other words, the parties agreed to treat the information obtained as private. Furthermore, the Court's conclusion that "[t]he addition of the redacted identifying information would not shed *any* additional light on the Government's conduct of its obligation," *id.* at 178 (emphasis

9

added), is in accord with this court's prior application of the test. The redacted information was withheld precisely because the Court recognized that, "in and of itself" it would not "tell respondents *anything* about Haiti's treatment of the returnees or this Government's honesty." *Id.* at 170–71 (emphasis added).

Perhaps most importantly, however, *Ray* involved redacted information, not wholly undisclosed records. The difference is not merely academic. Judge Tatel's version of the incremental value test would make little sense where, as here, a court is dealing with undisclosed records that are substantively dissimilar to records previously disclosed. Unlike *Ray*, where the redacted information was sought so that interviews with Haitians could be conducted anew, 502 U.S. at 178–79, disclosing the records of unconvicted persons would be neither duplicative nor speculative. It is reasonable to believe the six files could contain new information precisely because the records sought—unlike the Haitian interviewees—*are* qualitatively different. In fact, Judge Tatel agrees. Concurring Op. at 4 ("The disclosure of these six cases could also shed at least some additional light on the scope and effectiveness of [warrantless cell phone tracking]."). Nothing more is required.

At bottom, the public interest in disclosure remains as robust as it was in *ACLU I.* Conversely, in the Internet age, privacy is no longer what it once was. Times have changed, and so, too, must our expectations. I respectfully dissent.